Thank you. Mr. Bell, you may proceed. Thank you. May it please the court. My name is Justin Bell. I represent Amin Ricker in this appeal. Amin Ricker at the time of the alleged offense was a 20-year-old, 28-year-old man. He suffers from autism. That's not disputed. There's no evidence to say that's not the case. Specifically having what's previously referred to as Asperger's syndrome under DSM-5, that has been changed to just being on the autism spectrum. So if the court goes through the record, it may see varying different references to that. In part, that's because during the time of the diagnosis and thereafter, DSM's changed, but it doesn't substantially change the condition that my client had. One of those symptoms is having a severely decreased maturity level. There's evidence in the record from both Dr. Pribble and Dr. Flynn that relates to part of that being attracting friendships to children. Part of that relates to really it being like a 10-year-old, the maturity level of a 10-year-old and a 28-year-old person's mind. That doesn't mean that he's not intelligent, but it does mean that the maturity level is substantially different than what you would see for an adult that does not suffer from Asperger's or on the autism spectrum with the symptoms and conditions that he has. There are several issues that arise in this appeal. Five of them would result in requiring a new remand for a new trial. One is a sentencing argument. Once again, I would waive any right I have to just go ahead and make a presentation. If the court wants to address any specific issue, I would please ask you to get to it. I'll be honest, I struggle because there are so many issues that I think have merit in this appeal. I struggle with which one I should have addressed first, whether you go through the briefs and those arguments or start at the beginning. On reflection, I think what I'm going to do is go with what I think is most egregious error that was committed by the trial court. That was the allowance of the expert testimony of Anthony Emel in this case. That would be a question that relates to this. Then I'll work backwards from there. Part of the evidence was presented by the government in this case. The evidence presented by the government in this case was my client, Amin Ricker, committing sexual acts with the alleged victim in this case. There was no evidence in that case regarding any kind of I.D., nothing that would have an expert, you know, put a person on notice that an expert was going to say that there was a positive identification of my client committing on any of these videos until two weeks prior to the trial. This trial had been, this was a long case. I mean, if the court looks at the record, it had been pending for years before it was tried. Two weeks before the trial, after that continued various reasons before that, a notice was filed by the U.S. government without any kind of attachments to show what was going to be in the expert report that specifically said that the government was going to find someone from Quantico, an FBI expert, to state that Amin Ricker was in some of the video evidence that was there. At that point, we still don't have the expert report. The two weeks before they say, well, this is going to happen, we don't have a report, it will be supplemented. The defense doesn't get the expert report until trial. We're in trial at the time, or at least the week of trial that relates to this. The defense, when it gets this, asks for a continuance, and that's important because it differentiates some of the cases that were cited by the U.S. attorney's office in the brief. The defense says, look, if you're going to put evidence of this nature, give us a continuance to go and look and see what's there. It's a basic premise of constitutional law, that you have the right to know what an expert is going to say, specifically when you're looking at a case that has a 30-year mandatory minimum attached to it. The trial court said no to that request, in part because it had been a case that had been pending for a significant period of time. It also did not agree to exclude evidence that was proposed by the expert in this case, Mr. Emel. It's very important to know that, as it relates to that evidence, there was detailed findings that was there, and this is not harmless error. I must back up as to the law on this. I think it's pretty clear and it's been well settled, including in the cases cited by the government, that violations that don't give substantial fairness in Rule 16 expert disclosures are constitutional violations that affect, for example, due process rights in this case. And I would simply submit that being the only evidence where you put the stamp of the FBI and Quantico on it and say that we can positively identify someone's client is about as judicial as you can have and would certainly impact the jury's decision-making process here. The rationale of the trial court in this case was, well, the facts you were put on notice because you knew the pictures of a warrant was issued and pictures of your hand were taken at some point in time. However, that simply does not put anyone on notice that there was going to be an expert report that was going to positively identify someone. There's lots of reasons why that could have happened. For example, as argued by the U.S. Attorney's Office in their brief, my good friend, Mr. Elberson, they could have just put the pictures up and let the jury compare without any expert, just have the FBI's do that and say, look, these hands may mark, you know, this is a hand here. Make your own judgment, jury. That doesn't mean there's going to be expert testimony that relates to that. In addition... Mr. Bell, isn't that enough, though, to sort of put you on notice that there's at least going to be some attempt to say this is the hand of the defendant? And therefore, if you wanted to go out and find an expert to say, no, this is not the hand of the defendant, you probably would have done that anyway, right? You're trying to get what your prejudice is. Yeah, Your Honor, I would submit that that misconstrues what the basis for you would get an expert in a criminal case. And what I mean by that is, whether or not it is or is not my client's hands, the point of having an expert in a criminal case is to poke holes in the government's case. It's not that I have to affirmatively prove that my client, it's not my client's hand. If there's any scientific evidence that's put into the record where they're saying it's my client's hand, the expert that I have most likely is going to be putting holes or putting questions in the jury's mind about the potential expert testimony that the government is going to put. It may not be, for example, this isn't his hand. It may be the analysis done by the government's expert in this case is inappropriate. It wasn't properly done. I would also note that if that's the case, that's an incredible burden that you're putting on defense attorneys. Every time somebody goes into jail, DNA is taken. So is a defense attorney supposed to go to the court and ask for an expert to retain a DNA expert every single time because there's the possibility that two weeks before trial, there's going to be an expert that's disclosed on DNA. I mean, that is an absolutely unfair burden to criminal defendants in this case, and it would have the policy effect of dramatically increasing expert costs in CJA-appointed cases. And I know the court shouldn't take a look at whether or not somebody is indigent or not as a relation to this, but I just don't know how it would possibly work in any case where you could possibly imagine that there's factual evidence that can relate to an expert opinion that I'm supposed to, they're assuming a defense attorney is supposed to go in and seek an expert before we know that the government is going to put on evidence or relates to it. Because once again, this isn't a civil case. I think that the judge's rationale would make a lot more sense in a civil case than it would a criminal case, in part because in a criminal case, the burden is fully on the government to prove the guilt of my client. And a lot of times the strategy for defense is simply to poke holes in the government's case. I don't have to prove that it wasn't my client's hand. I just need to prove that the government didn't prove beyond a reasonable doubt that it was. And so that's the rationale that Roy said. And that's a good question. I appreciate you asking that question, because it goes to the heart of what the issue here is here, and it goes to the heart of what the district court determined. So on your honors, I would simply state that, you know, I would also note that Mr. Albertson stated that there needs to be a showing that it was prejudicial to my case. And I would simply state, one, I think that the case that's cited by Mr. Albertson doesn't necessarily say that. I mean, what I mean by prejudicial is that somehow I have a burden to show that I would have won, or I would have been able to show that it wasn't necessarily dispositive of an opinion. However, at this point in time, you know, without even having the evidence to be able to effectively cross-examine the witness, that's substantially diminished. Also, the cases that were relied on by Mr. Albertson all had situations that were, one, there were disclosed experts, but they had an opinion that went beyond the disclosure. They also had situations where there wasn't a continuous request, so they could prepare effectively for them. There was clearly a possibility for the court to allow the defense to have more time to prepare effectively, and that would certainly impact the prejudicial point. I spent a lot of time on that issue, so unless there's any further questions, I'm going to move on to some other issues. One quick one. Did the court give the defense counsel any time to digest this? It was disclosed two weeks prior to trial. We didn't get the expert report, I think, until Monday, which is the day the first trial was going. I'm sure that the government would say that since the expert was on the last day of trial, which I believe on Thursday, I believe, it had time from Monday until Thursday to digest it, and that's accurate, although I don't think that you can effectively retain counsel to review this, or excuse me, an expert to review this and get prepared for cross-examination while you're trying a major trial of this during trial. I just don't think that meets constitutional due process standards. Moving back, the briefing on this is fairly extensive, so I'm going to be brief on the other issues, so I have some rebuttal time, but as it relates to the suppression issue, it's simply stated, when someone says that my dad wants me to have a lawyer here, I believe that's effectively, or I would submit that that is effectively requesting a personal request for counsel, specifically when it's the person's POA, power of attorney, that was talking to police officers stating the same thing, and the law enforcement officer in the record knew that the client had Asperger's or had autism. I mean, all of this is in the record. I would submit that that's an appropriate suppression issue, that the testimony that was brought in by law enforcement officers or the state message in the record should have been suppressed. As it relates to the cover sheets, I'm going to rely on what's in the brief, so I can move forward with some other issues that relate to that. As it relates to Mr. Ricker being excluded from the trial, I do think this is an important issue. I mean, the U.S. Supreme Court in Henry Oliver specifically stated, without exception, all courts have held that the accused is at the very least entitled to have his friends, relatives, and counsel present, no matter what offense may be in charge. Now, I understand, you know, there may be some exceptions to some of that in certain case law, but at the end of the day, when you have a person who has diminished capacity, his father has moved to help him with his case, it's his power of attorney, and the court refuses to allow him in to the trial, we would submit that that is structural error, specifically when you look at what the potential use would be by the government, and that's essentially that he was on the phone with a law enforcement officer when the search warrant was executed. That's only a suppression issue, and the government has yet to proffer how a trial, any of that evidence was going to be offered by the government, because it wasn't on the defense witness list, it was on the government witness list, as it relates to this. Was the government going to intend to bring up suppression issues to a jury trial? I would have been in favor of that, but that certainly isn't the law that would allow that, as it relates to this. And so with that, there's no evidence proffered as to why Carl Ricker would have been a necessary witness for the government, other than the fact they just wanted him there. They wanted to disrupt the trial, they wanted to make it difficult for a man Ricker to be able to present a defense, and I would simply submit that that's the exact type of situation that Henry Oliver applies and that there is structural error that relates to this. Lastly, as it relates to the sentencing issue, unless there's any other questions by the court. The father was never called as a witness, right? That's correct, he was not called as a witness. And that goes back to, if he was truly going to be a witness, as a government's witness, not as a defense witness, it's not like I presented my case prior to the defense presenting his case. But yes, to answer your question, the short answer is yes, the father was not presented as a witness, either as a rebuttal witness, a defense witness, or in the government's case of cheating. Lastly, as it relates to the, well, related to the substantively unreasonable, I'm simply going to say I'm going to rely on my rebuttal by the government, and I will respond to any government arguments and rebuttal, and I would thank you for your time. Thank you very much. I reserve the rest of my time for rebuttal. Thank you. Okay. Mr. Albertson, you may proceed. Thank you, Judge Grunder, Judge Wolman, Judge Kovas. May it please the court, Mr. Bell, I'm Kirk Albertson. I represent the United States in this case. Between late 2014 and early 2015, the appellant, a South Dakota resident, traveled from South Dakota to Texas on multiple occasions for the purpose of sexually abusing twin seven-year-old girls who resided in Texas with their mother. In January 2015, and again in March 2015, the appellant created photos and videos of that sexual abuse, which he later saved and cataloged on other media storage devices. Law enforcement in Texas began investigating the abuse in December of 2015, but at that time, the victim denied even knowing the appellant. So it wasn't until early 2017 that the appellant attracted the attention of law enforcement in South Dakota, and that was based on indications that he was sharing child pornography online. That led local law enforcement to getting a search warrant, and his residence was searched. Multiple electronic devices were seized, and among the thousands of images of child pornography that were discovered on those devices, there were images of him abusing the victims in Texas. At trial, both victims testified about the abuse that they were subjected to at the hands of the appellant. Their mother testified about the abuse that she claims to have witnessed. That testimony was corroborated by the forensic evidence, which is considerable. It was also corroborated by evidence of the defendant's travels, which included bank statements, airline records, and his employment records. The evidence of the appellant's guilt in this case is overwhelming. This is not a close actual case. Regarding the issue of Mr. Immel's testimony on the comparison of the photographs, the appellant received sufficient pretrial notice of the intent to offer expert testimony regarding that hand or finger comparison. Ultimately, it was a comparison of a single finger in a photograph that was taken pursuant to a search warrant compared to a cropped still image from one of the videos that was on his devices. The district court found, properly found, that the appellant was on notice in November of 2018 when a search warrant was executed and photos of his hands were taken. There were no deadlines set by the court that were missed. The expert notice filed on March 5th was prospective. It essentially said, this is what we anticipate. We're going to hear from this expert. The district court found that upon receipt of the expert's report and his information, that the notice filed on March 5th accurately reflected what the testimony was going to be. The amended notice was filed on March 15th, I believe the Friday before trial. Mr. Immel did not testify until the last day of trial. He was the last witness that testified. He testified on unlike Davis, the DNA case, this is not a case with highly technical or highly scientific evidence. It really was a cropped, zoomed in comparison of images of a finger. The images were enhanced to show the similarities. And as we stated in our brief, the images themselves, um, when shown up close, uh, with arrows pointing out to a similar scar or a similar fold, that was really what was more probative than Mr. Immel's testimony. Even assuming, however, that, uh, uh, the notice was untimely as Mr. Bell claims, there was no prejudice. Mr. Bell talked about this distinction between, um, uh, what is prejudicial versus what is probative. You know, the significance of the evidence definitely shows it's probative, but that does not in turn mean that it's prejudicial. Uh, the appellant was able to fully cross-examine Mr. Immel, uh, including on the reason for the timing of his, uh, report, uh, as well as in the thousands of images that he could have looked at, he only looked at two images. He was able to be, the appellant was able to fully cross-examine on all those issues. Um, and this is the issue of prejudice because appellant has made no showing of how he could have forced the exclusion of this evidence, or he could have presented a more effective defense if he had been given more time. Well, I think Mr. Bell thought somewhat persuasively argued that, um, you know, it didn't give a trial counsel enough time to go out and have another expert look at the report and potentially poke holes in the methodology used by, by the government's expert. Your Honor, I think that I would disagree respectfully. I think Mr. Bell had ample time to review the information, digest the information, consult if he wanted to. He had an opportunity to speak to Mr. Immel if he wanted to. Mr. Immel was available, um, for questioning, um, because really the, the essence of his testimony was let's zoom in on these photographs and point out the ways in which these two fingers are similar. Um, I think that's an important distinction between this, the type of expert testimony that we're talking about versus for instance, DNA testimony, which relies on, uh, machine generated data. Uh, and there is a considerable scientific underpinning that you have to understand, um, to be able to present it through the testimony on direct of an expert or to cross examine such an expert. This was a little bit more, uh, um, intuitive, uh, I would argue, and, and not the kind of testimony that required, uh, the consultation necessary consultation with, uh, a defense expert consultant. Um, Mr. Edwardson, may I jump to another issue? Yes, absolutely. Why was the father on the, on the witness list? So, um, you know, the defense suggestion that, uh, Carl Ricker was not going to be a witness at all, that he had no, um, possible value as a witness, I think dramatically understates his involvement in the case. Um, uh, as, as we've mentioned in our brief, Carl Ricker testified at the suppression hearing in this case, because he was on the phone with the appellant the day the search warrant was executed. Um, so, uh, he was a witness regarding any testimony that would have happened, uh, regarding what happened at the house that day. Um, and I think that's significance because, um, there was nothing stopping the defense from, uh, furthering their argument. He wasn't a witness to what happened at the house. He was on the phone. Yes, your honor. Right. He was on the phone. So he spoke to the appellant that day. He, uh, he also, so far you haven't, you haven't proffered anything that he, cause you're not going to re-litigate the suppression at the trial, right? Correct, your honor. So tell me what it is he possibly could have testified. Other, it sort of looks like a little hardball technique. Your honor. That is not the only thing that, um, Mr. Ricker, Carl Ricker testified to at the suppression hearing. He also talked about the defendant's, uh, diagnosis of Asperger's syndrome or, uh, autism spectrum disorder. And obviously he's known the appellant his entire life. He talked about his personal observations or the personal characteristics of the appellant, uh, essentially that he was socially inept. Was the government intending to put on that kind of evidence? Your honor. I think that there was the potential, uh, at least we foresaw the potential that, uh, that there was going to be an attempt to, um, maybe not directly re-litigate the suppression issue, but put this kind of information in front of the jury, uh, in an effort to make him seem that, uh, he was socially inept, unable to make his own decisions, uh, unable to comprehend what was going on. And, and, um, Carl Ricker had previously talked about these kinds of things. He had called. It makes sense to me that the government or the, excuse me, that the defense might do that. Just don't understand why the government might do that. I think realistically, your honor, where we most saw the potential for Carl Ricker to testify was in rebuttal, uh, depending on what the defense might've presented regarding the appellant's, uh, um, mental health diagnosis. We received notices about it, but those notices were very cryptic. Um, and so we certainly saw the potential that, uh, Mr. Ricker, uh, could end up testifying as a defense witness, also testifying as our witness. Um, he had, he had described things about the appellant. He had talked about the prior child pornography case, uh, in state court. He described that as a farce. Um, he described the, he also described the appellant as smart guy, self-sufficient. So we saw the potential that if the appellant got on the stand and tried to make it sound like he was unaware or didn't know what was going on, maybe Ricker, maybe Carl Ricker is a, uh, rebuttal witness on that point. Um, he also had described, uh, um, made, made statements suggesting that the allegations were somehow him being taken advantage of by, by the parents of, uh, of the victims. Um, so he had made statements characterizing what the appellant did, uh, that we foresaw might end up being relevant depending on how, uh, the defense proceeded. And we, and we certainly foresaw the possibility that, um, the appellant might want to more fully litigate the, um, events of the day of the search and appellant's interview. There's nothing stopping them from, um, pursuing, uh, the circumstances of the interview and the search, even though the court has ruled, uh, that evidence is coming in. Um, and so for those reasons, we foresaw that, that, uh, Carl Ricker, uh, could be called as a witness, um, which is why we sequestered him. May I jump to another? Yes. How did the cover sheets possibly get into evidence? So your honor, the, the cover sheet, I respectfully disagree, your honor, the cover sheets, I would say the information that's in the cover sheets falls into three different categories. Um, because some of the cover sheets really just contain information about a device. Um, one of the ones we referred to is exhibit 19. What exhibit 19 actually has on it is the make and model of the device, which is visible in the pictures of the device that were attached. Um, it's, it's, you know, what I would characterize as machine generated data. Yep. Here's what the full make model serial number of this device is. Um, and, uh, uh, that's not statements. So I would say some of the cover sheets really don't contain a statement by any person that would even subject them to a hearsay consideration, but that's just one category. I realize, um, there is a second category of cover sheets, um, that were admitted sort of describing, uh, a set of files, um, where the cover sheet includes, uh, the device that the items were taken from, and then information about the files that are contained in that exhibit. For instance, it includes file names, the location that the files were found at, uh, the created date. Those are also, I would submit not hearsay statements. They're not statements by a person, they're machine generated data, um, that describes, uh, file properties, uh, of particular exhibits, particular evidence. When you say machine, machine generated, my understanding is that these were agent generated. Well, I think it created the, the file sheet. They may have taken it from a machine or from a computer, but that's still testimony. I think that's a, that's, that's fair. And I think the record could be clear on this point, your honor, that, uh, we could have made it more clear that what the device contained was a summary of machine or what the exhibit contained, the cover sheet contained was a summary of machine generated data. Um, the one we referenced, I mean, a 302 is a summary of, of the interview and we don't generally admit 302s that I'm aware of. Right. I agree with that. Absolutely. Your say that a 302 is a summary of a person's statement. Um, uh, and so absolutely that would be subject to hearsay rules. What I'm, what I'm describing now is a exhibit that is a summary of essentially a summary of machine generated data. The one we referred to in our brief specifically is the cover sheet at exhibit 20. What exhibit 20 actually has on it, it has, uh, two headings. The first heading is device information. So it has the, uh, description of the device, the, uh, forensic report number that it was addressed in. Um, and then it also has, uh, it says listed as item number two on evidence inventory receipt. So it ties it to, uh, other information. Um, then it says exhibit contents and it says, uh, this exhibit contains a total of 12 image files consisting of six thumbnail image files and six full size image files. It's again, describing the contents of this file structure. Um, the piece to me, uh, that is testimonial that I think is really an issue is on this exhibit is the image. It says the image files in this exhibit are visually identical or visually similar to the images files that were reported. And then it refers to several cyber tip numbers. So it's tying it to, here's where these other images show up. This, this testimony, um, or this exhibit is created by the special agent that did the forensic exam, uh, special agent Russell. That statement that I just read is consistent with what he testified to. Um, he, he said, this is, this is my, um, uh, assessment of these images. Um, and then it's in writing, um, that piece of it. I agree. That's a statement by a person, but it's consistent with his testimony on this issue. Um, and, and that piece to me is the heart of the objection as to this exhibit. And I would say the admission of this exhibit exhibits 20 is harmless error. It's because it's cumulative with what the witness has said. It also makes it a little bit more easy to digest his testimony. There were, um, approximately 200 exhibits in this case. Many of the exhibits were, uh, or evidence of this nature, uh, with cover sheets on it. Um, and then I, I guess I should talk about, um, there is sort of a third category of cover sheets. And those are ones where the, um, the one I referenced was exhibit 26 exhibit 26, uh, is a extraction report. The cover sheet on it again refers to the device, uh, and then refers it to here's the report that that device is tied to. And here's the item number on the evidence receipt. And it says contents. It says the exhibit consists of a document containing search items entries that were covered from the internal memory of the Apple iPad described above this document contains a total of four keyword searches containing terms that are associated with child erotica and child pornography. That's a characterization. Absolutely. That's a statement. That's an opinion of the expert. Um, it was consistent with his testimony. Uh, and the judge gave limiting instructions, um, regarding this opinion about child erotica and child pornography. There was a limiting instruction on the issue on this issue, similar to there were other cover sheets where the, uh, witness opined, uh, who was the person appearing in the image and the judge similarly gave limiting instructions in that regard. So I, I appreciate the, the court's concern, but I think really, um, uh, the objectionable pieces, uh, are somewhat limited and they were addressed appropriately with limiting instructions. Uh, to the extent that there was air, your honor, it's the government's position that any air, uh, in admitting, uh, the hearsay statements in these cover sheets, um, was, uh, harmless. And defense counsel did object, right? Yes, your honor, there was a standing objection, uh, to the cover sheets. Absolutely. I want to speak briefly about, uh, the other issue appellant's counsel raised the suppression of the statements. This was a subject of a motion to suppress the, uh, the magistrate considered it, the district court considered it. Uh, the judge found the court district court found properly, uh, that the appellant was not in custody at the time of the interview. He did not invoke his right to counsel and his statements were not involuntary. Uh, and therefore the motion to suppress his statements was properly denied. Your honors, I don't have any additional points unless the court has additional questions. I will ask that this court affirm the district court judgment and sentence in all respects, and I will yield the balance of my time. Hearing no questions, um, Mr. Bell, you're up for rebuttal. Mr. Bell, you may want to, uh, unmute your mic. I apologize for that. Thank you. Um, I, uh, I want to start with, um, the cover sheets because there's a lot of discussion about that. Um, one, as I heard the argument from the government, the, the biggest defense they had regarding the vast majority of the testimonial information that was provided in militias, it was harmless. I mean, they essentially conceded that it was there, but it was harmless. There were a handful of exhibits that fall into the computer generated information, uh, that Mr. Albertson's and it would take me an hour to go through them all because it's 19 to 257 of the exhibits we're talking about. And it's over 200 pieces of evidence were able to summarize testimony and bring them back into the jury room. And to say that that's harmless error for, for some, I mean, it would be like allowing, that was a great example you brought up with 302. It'd be like allowing a FBI agent to summarize their testimony and bring, let the jury come back and bring them all back into the jury room. I mean, I would, I would submit that of course, improper, um, emphasis on them. It is vouching. Yeah. Was there, was there anything that was in a cover sheet that would have been significant that wasn't also testified to by the agent? I would submit that the vast majority was also testified to cause they were essentially rad. I mean, they were, they were the testimony. They were the summary of this testimony. So I can't say that they weren't testified to. I'm also not bringing a confrontation clause. I mean, the briefing that Mr. Albertson has kind of confuses confrontation clause issues with evidentiary issues. Um, this isn't a straight up hearsay issue that relates to this. Um, and so, I mean, but to answer your question, um, I, I'm not aware of anything nor did I object to anything in trial that said that, well, he didn't testify to this. So I'm not coming in the majority of it was testified to. Um, but I also want to say that not, not only was there a standing objection, Mr. Albertson, I specifically objected to every single piece of evidence and made a record on every single one of them. So if the court wants to look at the transcript and go page by page and see every objection that was made, it may do, may do that. Um, as it relates to, um, the MO issue, the expert, um, I would respectfully disagree with the government saying, well, this was just kind of common sense stuff in part by saying there were roughly like 200 pages, hundreds of pages of, of data and graphs that were used trying to show point by point what this information was. And there was a substantial methodology that was used that was attached to this S4 report. It was very similar to what DNA evidence is, um, where you get a couple pages of a summary of what it is. And if you get the rest of the, um, information, there's several hundred pages of what nucleotides, um, match and don't match. It's the same thing here. There was the exact same type of computer generated and expert analysis that was done, um, to, to make the argument, this was just kind of common sense. Then the government should have just done what I stated and not hire an expert and put up the picture side by side and let the jury make their own determination. But when the FBI gets to have an expert, um, come and testify that, well, the science is backing this determination and then to on appeal say, well, it wasn't really science. It was common sense. Um, that's an, that's improper vouching to some degree. And then vouching is not the right word as it's all, but it's an improper, uh, emphasis. Um, and it certainly would be prejudicial if the basis is that, well, it would be harmless error because the jury can make this determination on, um, as it relates to, um, Mr. Rickard being excluded. You know, I just want to say that all of the arguments that Mr. Albertson brought up as to why his testimony would be sod were arguments that I would have, that the defense counsel would have made. All of the testimony relates to, uh, whether or not, um, we would have tried to put evidence onto his mental status or suppression issues. He, there's yet to be a situation that why Mr. Albertson would affirmatively in their case do that. Um, and there's no showing that they would have been. Um, so with that, your honors, I thank you very much for your time. I would rely on the briefing for any issues that were not covered in the oral argument and, uh, appreciate your consideration of this case. Thank you. Thank you, counsel. We appreciate your briefing and arguments and your appearance here today and your cooperation with our staff to be able to do this by video. Um, this case will be submitted and decided in due course.